UNITED STATES BANKRUPTCY COURT
IN AND FOR THE WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CASE NO. 09-05048

In Re:

      Chase Bank USA, N.A. vs. Turnbow

    Trial

Heard Before:
      Honorable Thomas H. Fulton, United States
      Bankruptcy Judge for the Western District of
      Kentucky, at the Paducah Courthouse, Paducah,
      Kentucky, on April 15, 2010.


Transcriptionist:
    Karen D. Cunningham
    11111 Benson Way
    Louisville, Kentucky 40272
    (502) 937-1777

<u>A P P E A R A N C E S</u>

Steven S. Crone
Crone & Roby, LLP
227 Saint Ann Street, Suite 420
Owensboro, KY  42303

Steve Vidmer
309A North 4th Street
Murray, KY  42961

1      (Proceedings began at 12:08 p.m.)

2           THE COURT:  This is the matter of Chase Bank, USA,

3    N.A. versus Turnbow, 09-05048.  Mr. Vidmer, Mr. Crone.

4           MR. VIDMER:  Good morning, Judge -- or afternoon.

5      (The Court confers with the Clerk.)

6           THE COURT:  Have the parties been able to visit

7    with each other?  Have you visited?

8           MR. VIDMER:  We've talked on the phone.

9           THE COURT:  Okay.

10          MR. CRONE:  It's been a while since we done that,

11   though, Your Honor.

12          MR. VIDMER:  Yeah.

13          THE COURT:  All right.  Why don't we start with

14   opening arguments -- because I'd like to hear what you have

15   to say.  We'll start with you, Mr. Crone.

16          MR. CRONE:  Your Honor, this issue arises out of

17   use of a charge card -- a MasterCard that Mr. Turnbow had

18   since 1994.  And a number of charges were made on that card

19   shortly before the bankruptcy was filed.  And, in

20   particular, there was a purchase of a tractor -- and that

21   was revealed through the answer and discovery request on

22   June 18, 2009.  It was a tractor or a mower, of some type,

23   for over $8,000.

24          Pursuant to request for discovery, it was revealed

25   that on or about July 13 was when Mr. and Mrs. Turnbow

1   sought counsel regarding bankruptcy filing.

2            On July 3, 2009, there was a $650 convenience

3   check -- or a check taken off the account.  And, again, it

4   was revealed in response to discovery that this was used to

5   pay contract labor.  And this was done ten days prior to the

6   bankruptcy filing.

7            We believe that the purchases and cash advances

8   under -- well, particularly the purchases under the credit

9   card -- fall within the luxury goods provision of

10  523(a)(2)(c) and that the burden of proof has shifted to the

11  Debtor on the issue of dischargeability.  What the Court has

12  to consider on -- whether an item is a luxury purchase -- is

13  whether it serves a significant family function and whether

14  the purchase shows financial irresponsibility.

15           In looking at the documents that were submitted

16  with the bankruptcy petition regarding this lawn service

17  business, from January through June -- the six months prior

18  to filing -- it only showed a profit in one month out of

19  those six, and that profit was really insignificant.  It was

20  under $200, I believe.

21           So, really, the only income that the Debtors had

22  prior to filing was from pension and Social Security.  Yet,

23  just a few days prior to bankruptcy filing -- or seeking

24  counsel about bankruptcy and the bankruptcy filing -- this

25  large purchase was made.  So I think the burden has shifted

1    to the Debtors to prove that this debt is dischargeable.

2            THE COURT:  All right.  Mr. Vidmer, I'll be glad

3    to hear from you.

4            MR. VIDMER:  Yes, Judge, we -- first of all, we'll

5    put on testimony the -- my clients -- that, at the time they

6    made this purchase, they were still in the lawn business;

7    they were trying to make the lawn business fly.  There had

8    been a downturn in the economy, and, obviously, from January

9    through June, the profitability would be less than it would

10   be expected to be June through October, when people are

11   paying to have their lawns mowed.

12           We think that there are three issues for the Court

13   to decide.  First of all, whether buying a lawnmower to use

14   in a preexisting business is considered a luxury.  Also, in

15   my mind, there's a question whether it's a consumer debt, as

16   talked about in Section 523, 'cause it refers you to

17   Section 103 of the Truth in Lending Act."  And it says and

18   money, property, or services which are the subject of the

19   transaction are primarily for personal, family, or household

20   purposes.  These were not.  I mean, this mower was bought to

21   try to keep a business afloat.  They had some mowers go

22   down, and they were just trying to keep the business going.

23           You'll hear testimony that -- what precipitated

24   the bankruptcy filing a month later -- and if I can go back

25   a little bit, these people sold their mowing business to a

```
 1    third party, back in about 2006 or '7 -- something like
 2    that.  In order to sell it, they had to co-sign the note
 3    with City National Bank, in Metropolis.  And this person
 4    defaulted on the loan, and so they were forced to take the
 5    business back.  And they were in the process -- they'd had
 6    it for -- what -- about a year and a half before that --
 7    been operating?
 8               UNIDENTIFIED MALE:  Yeah.
 9               MR. VIDMER:  In 2008, business was better than it
10    was; 2009 -- or, you know, September of 2008, the economy
11    tanked, and we had the ice storm.  And they were trying to
12    make everything -- they assumed that they would be able to
13    be profitable.  And that was the reason for the purchase of
14    the mower.  I mean, ultimately, the mower went back to City
15    National Bank.  They had a lien on all equipment, you know,
16    all now or hereafter acquired -- used in the business.  And
17    so the mower went back to City National Bank.  It wasn't
18    like they profited from this mower, but they expected that
19    they would.
20               And what happened was two things.  Mr. Turnbow had
21    shoulder surgery in June of 2009 and had to hire somebody to
22    do the duties that he usually did himself -- which that cost
23    him about twelve, fifteen hundred dollars a month.  And they
24    were on a narrow profit margin, and that caused problems.
25    And it caused them to become late on the note to National
```

1    City Bank.  And small banks being sort of –– oh, I don't

2    know –– like they are today, you know, they just –– it used

3    to be you didn't hear from a bank until you were 30 days or

4    40 days behind on a note.  They got a call, like, the next

5    day.  They say, "What's going on?"

6            And they say, "Well, you know, we're having –– you

7    know, I've hurt myself; I've had to hire somebody," yada,

8    yada, yada.

9            Next day, they were out, looking at all –– looking

10   the equipment over to see, you know, checking their

11   collateral out.  And that's when they came to see me, to

12   talk about the possibility of bankruptcy.  Because if City

13   National was going to take back all of their equipment, they

14   obviously couldn't continue to do business.  So it was those

15   two things –– the surgery and the City National –– that

16   really made things go down the tubes.

17           The City National Bank was about a thousand dollar

18   a month payment.  The thousand dollar a month payment for

19   June or July –– whichever month it was –– whenever it was

20   late –– went to pay this additional employee that they

21   didn't have to have before the surgery.  And so, I mean,

22   I –– you know, we have three –– we –– first of all, at the

23   time they bought the mower, you'll hear testimony they fully

24   intended and thought they would be able to pay for it, based

25   on last year's business.

```
 1              THE COURT:  All right.

 2              MR. VIDMER:  We don't think a mower used in the

 3    course of a business is a luxury item, by any means, and I

 4    think there's a big question about -- under the Truth in

 5    Lending Act, Section 103, whether this constitutes a

 6    consumer debt.

 7              THE COURT:  All right.  Mr. Vidmer?

 8              MR. VIDMER:  Okay.

 9              THE COURT:  I mean, Mr. Crone, I'll be glad to --

10    you can put your proof on.

11              MR. CRONE:  Plaintiff calls Chad Turnbow.

12              THE COURT:  Okay.  Mr. Turnbow?

13              MR. TURNBOW:  [Inaudible].  Where do you want me

14    to go?

15              THE COURT:  I want you to come right up here.

16              MR. TURNBOW:  Oh, okay.  Okay.  On the hot seat.

17    Okay.  My first experience at this thing.

18              THE COURT:  Mr. Turnbow is the only defendant?

19              MR. CRONE:  Yes, Your Honor.

20              THE COURT:  Are you going to call both Mr. and

21    Mrs. Turnbow?

22              MR. CRONE:  I don't believe so.  I don't

23    anticipate that, Your Honor.

24              THE COURT:  Okay.  So you don't need to --

25              MR. CRONE:  I don't think so.
```

1          THE COURT:  -- sequester the Witness.

2          MR. CRONE:  I don't believe so.

3          THE COURT:  Okay.  All right.

4      CHAD BROOKS TURNBOW, PLAINTIFF'S WITNESS, SWORN

5                     DIRECT EXAMINATION

6          MR. CRONE:  Your Honor, before I start asking

7  questions, we've -- I've submitted my exhibits.

8          THE COURT:  Yes.

9          MR. CRONE:  I have the hard copies here --

10  labeled.  Do you want to look at those, or are you going to

11  be looking -- I'll be happy to provide those to you.

12          THE COURT:  Now, those --

13          MR. CRONE:  You have a set, I believe.

14          THE COURT:  I have a set.  Now, are those -- which

15  ones do you want?  Which ones do you need [inaudible]?

16          THE CLERK:  The originals.

17          THE COURT:  Those are the originals you have,

18  there?

19          MR. CRONE:  The originals, I have, here.

20          THE COURT:  Those will need to be -- if you'll

21  give those to Ms. Estrada.  And those would be the ones

22  in --

23          THE CLERK:  Do you have copies?  Do you have

24  copies?

25          THE COURT:  I have a copy.

1     THE CLERK:  Okay.

2     THE COURT:  I have a copy of everything, but the

3  originals --

4     MR. VIDMER:  Judge, if I may, Mr. Crone said he --

5  she doesn't intend to call Mrs. Turnbow.  She was more or

6  less the bookkeeper and is more familiar with the finances.

7  So he may find, after Mr. Turnbow's answers, that he would

8  want to call her.  So I just want to remind Mr. Crone of

9  that.

10     MR. CRONE:  Okay.  Then I'd like her sequestered,

11  then.

12     THE COURT:  Okay.  Then let's step out of the

13  room, Ms. Turnbow.

14     MRS. TURNBOW:  Pardon me.

15     MR. VIDMER:  Yeah, you have to wait out in the

16  hall.

17     MRS. TURNBOW:  Oh.

18     MR. VIDMER:  In the hallway, there.

19     MRS. TURNBOW:  Okay.

20     MR. CRONE:  And, Your Honor, since there have been

21  no objections to the exhibits, I'll move that all of them be

22  entered into evidence at this time.

23     THE COURT:  Right.

24     MR. CRONE:  Okay.

25  BY MR. CRONE:

1   Q.  All right.  Would you state your full name and address,

2   please?

3   A.  Chad Brooks Turnbow, 1097 State Route 1241, Mayfield,

4   Kentucky.

5   Q.  And what is your occupation?

6   A.  Well, I'm retired.

7   Q.  Okay.  What was your previous occupation?

8   A.  Before the lawn-care business, you mean?

9   Q.  Well, before you retired.

10  A.  Oh, I worked for USEC or Martin Retta (phonetic),

11  Lockheed -- the nuclear plant, out here, at west Paducah --

12  USEC.

13  Q.  Okay.

14  A.  United States Energy Enrichment Corporation.

15  Q.  And what period of time did you work there?

16  A.  Nineteen sixty-eight 'til 1998 -- 30 years.

17  Q.  All right.  From 1998 forward, have you been employed or

18  engaged in any business of any kind?

19  A.  Well, yes, sir.  I've had a lawn-care business on two

20  different occasions.

21  Q.  Okay.  And was that business incorporated, in any way,

22  or did you do business as a sole proprietor?

23  A.  Well, it was a sole proprietor, but the first attorney

24  that we had wanted to incorporate -- or LLC, I believe.  And

25  so we did that.  And then we sold the business and basically

1    retired again -- and then had to take it back the second

2    time.

3    Q.  Okay.  Well, when is the date of your last retirement?

4    Let me just ask that.  When did you retire?

5    A.  Well, I guess you might say when I had to file the

6    bankruptcy.  But I actually retired --

7    Q.  The bankruptcy was your retirement.

8    A.  -- when I had my shoulder surgery.  I couldn't work

9    anymore after that, 'cause they had to take a bunch bones

10   out.

11           MR. CRONE:  And, Your Honor, may I approach the

12   Witness to hand him a copy of these --

13           THE WITNESS:  Yeah.

14           MR. CRONE:  -- exhibits so we can go through --

15           THE WITNESS:  I mean, I don't remember a lot of

16   these dates and things and stuff -- yes.  I'll try to be as

17   clear as I can.

18           MR. CRONE:  All right.

19   BY MR. CRONE:

20   Q.  All right.  Mr. Turnbow, what I've handed you are the

21   Plaintiff's exhibits that have been entered into evidence.

22   And I'm going to ask you a few questions about those.

23   A.  Certainly.

24   Q.  First of all, refer to Plaintiff's Exhibit 1.  This is

25   your bankruptcy petition.

1    A.  Okay.

2    Q.  And if you look at that first page, there, in Section 1,

3    Statement of Affairs, it says, "Income From Employment or

4    Operation of business."  Do you see that?

5    A.  Oh, certainly.  Yes.

6    Q.  Okay.  Now, it's marked none.  So is it true that you

7    had no gross income from business from January 1 through

8    2009 through July 31, 2009?

9    A.  Myself and my wife, in the -- in this business, I took

10   no income.

11   Q.  Well, the question asked for gross income from business,

12   and you marked none.  So is that a correct statement in your

13   petition?

14   A.  Oh, no, no, no.  I thought you meant for myself -- well,

15   the business -- I don't know what the gross income for the

16   business was --

17   Q.  Okay.  But, now --

18   A.  -- at that time.

19   Q.  -- this business -- was it a sole proprietorship?

20   A.  Well, yes -- my wife and I; I guess you could say it was

21   a partnership or proprietorship, but it was ours -- just us.

22   Q.  Okay.

23   A.  My wife and I.

24   Q.  But you've marked none for 2009.  So is that an

25   incorrect statement?

1    A.   Two thousand and nine?

2    Q.   Well, the question provides --

3    A.   Yeah -- no, the business had an income, yes.  It was

4    incorrect -- I took this as personal income.  I didn't -- I

5    didn't realize, at the time I marked this, that it was

6    talking about -- my bad, I guess, but, yes, the business --

7    I quite naturally had an income for a period of time in

8    2009, yes.

9    Q.   Okay.  What about for 2008?  Did the business have

10   income for 2008?

11   A.   Just a -- well --

12   Q.   And when I say income, did it have gross income?  Did it

13   make --

14   A.   I --

15   Q.   -- gross income?

16   A.   We did -- we took it over in October of 2008, when we

17   had to assume it again.  I believe it was October.  Possibly

18   could have been a little in 2008, but I don't recall.  It

19   was -- November, December; there's not much going on, but --

20   Q.   Okay.

21   A.   --  I don't recall that --

22   Q.   But, again --

23   A.   -- to be honest with you.

24   Q.   -- in question one, there, you put nothing for 2008.  So

25   that would be an incorrect statement; is that correct?

1    A.   I don't -- I can't say whether it would be correct or

2    incorrect because I don't recall, in November or December,

3    if we removed any snow or mowed a lawn.  I don't recall that

4    far back.

5    Q.   But for 2008, did the business make any money, at all?

6    A.   For me or for --

7    Q.   Did -- well, did you do work, and were you paid for

8    business in 2008?

9    A.   Well, I honestly can't -- you think I'm messing with you

10   here, but I'm not.

11             THE COURT:  Well, I think he's answered, Mr.

12   Crone, that they took it over in October of 2008, and,

13   because the nature of the lawn-care business, he doubts that

14   there was any income in November and December --

15             THE WITNESS:  Well, there --

16             THE COURT:  -- of 2008.

17             THE WITNESS:  There could have been, yes.

18   There --

19             THE COURT:  But you don't --

20             THE WITNESS:  -- possibly could --

21             THE COURT:  But you don't know the answer to that.

22             THE WITNESS:  But I -- no, I can't recall if it

23   was a small amount or one or two yards we mowed, or what --

24   I don't recall.  But I'm -- there possibly could have been

25   some, yes.

1       THE COURT:  Would your wife know?  Would your

2    wife --

3       THE WITNESS:  She would know, yes.

4       THE COURT:  Okay.

5       THE WITNESS:  She kept all the books.  I just --

6       THE COURT:  Okay.

7       THE WITNESS:  -- did the work.

8    BY MR. CRONE:

9    Q.  Okay.

10   A.  Yes.

11   Q.  Mr. Turnbow, would you turn to Plaintiff's Exhibit 6?

12   You're going to have to flip back through there.

13   A.  Six.  What page would that be?  Schedule B -- well, I

14   don't know exactly where that --

15       THE COURT:  Mr. Crone, if you want --

16       THE WITNESS:  -- just not at the bottom, like this

17   other one?  Exhibit --

18       MR. CRONE:  I'll try to find it [inaudible] --

19       THE WITNESS:  Yeah, please.  You'd know more where

20   to look.  I'd look through every page before I could find

21   it.  Thank you.  Oh, here.  Okay.  Okay, yes.

22   BY MR. CRONE:

23   Q.  All right.  Plaintiff's Exhibit 6.  And what is that

24   document?

25   A.  That's --

1    Q.  Is that your 2008 tax return?

2    A.  Probably is.  I guess -- yes, I think it is.

3    Q.  Okay.  And would you flip through that and find

4    Schedule C of your federal return, please?

5    A.  Okay.

6    Q.  And that should say "Profit and Loss from Business."

7    A.  Schedule what, now -- C?

8    Q.  Schedule C.

9    A.  Schedule M.  Well, it's -- oh, here we go.  Yes.  Okay.

10   Q.  Okay.

11   A.  Yes, sir.

12   Q.  And does it show a business name -- America Lawn and

13   Landscape?

14   A.  Yes, that was the name of the business.

15   Q.  And does it show gross receipts of $83,234?

16   A.  In '08?

17   Q.  That's what I'm looking at, sir.

18   A.  Oh.  Wait a minute.  Wait a minute.  Oh nine.  Oh, I

19   took the business over in '07.  I'm sorry.  I think I had to

20   take it back over in '07 -- November of '07.

21   Q.  Okay.

22   A.  I had it in '08.  And on -- yes.  Yeah.  Yeah.

23   Q.  All right.

24   A.  I got mixed up on my dates.  You --

25   Q.  Okay.  So you did have --

1    A.   You're right.  Yes.  Yes.

2    Q.   -- you had gross income from business -- of eighty-three

3    thousand, two thirty-four -- in 2008, correct?

4    A.   I think so.  My wife would know better off, but, yes --

5    Q.   Okay.

6    A.   -- I believe you're right, yes.

7    Q.   But that wasn't stated on your bankruptcy petition, is

8    that correct?

9    A.   It was or wasn't?

10   Q.   Was not.

11   A.   I don't know if it was or not, to be honest with you.

12   Q.   Okay.  Well, let's look back at Plaintiff's Exhibit 1

13   again.

14   A.   Okay.

15   Q.   First page.

16   A.   All right.

17   Q.   And that's checked none, is that correct?

18   A.   I don't -- yes.

19   Q.   Okay.  Did you file an amendment to correct this error?

20   A.   Didn't know there was an error --

21   Q.   All right.

22   A.   -- 'til just now.

23   Q.   Okay.  Next I'd like for you to look at Section 18 on

24   Exhibit 1.

25   A.   Section --

1    Q.  Eighteen.

2          THE COURT:  Mr. Crone, just go over and point it

3    out to him.

4          MR. CRONE:  See if I can find that for you, sir.

5          THE WITNESS:  Section 18 on Exhibit 1.  Okay.

6    Yeah, I got this.  Okay.

7    BY MR. CRONE:

8    Q.  Now, that section, the heading is "Nature, Location, and

9    Name of Business."  Says if the Debtor is an individual,

10   list the names, addresses, taxpayer identification numbers,

11   and nature of business.  Now, that's checked none; is that

12   correct?

13   A.  I guess it is, yes.

14   Q.  Okay.

15   A.  Well, yes.

16   Q.  But you did operate a business within the last six

17   years, did you not?

18   A.  Oh, yeah.

19   Q.  Okay.  So this is an error on your bankruptcy petition?

20   A.  I don't know.  I'm taking your word that it is.

21   Q.  Okay.  All right.  Next, I'd like you to refer to

22   Schedule I on your bankruptcy petition.

23   A.  I?

24   Q.  That should say "Current Income."

25   A.  Just a minute, let me find I, here.

1    Q.  You're very close to it (phonetic).

2    A.  I'm -- I figured it would be very close.  Oh, is this

3    it?  Oh, okay.

4    Q.  Okay.  Now, that states your monthly income.

5    A.  Okay.

6    Q.  Now, it states that it has no income from business or

7    wages or earnings -- for either you or your wife.  Is that

8    correct?

9    A.  Right.

10   Q.  No projected income.

11   A.  Yeah.

12   Q.  Matter of fact, all the income on that is from Social

13   Security and retirement funds?

14   A.  Uh-huh.

15   Q.  Would that be correct?

16   A.  Yes.

17   Q.  Okay.  And your total average monthly income's

18   $4,100.85; is that correct?

19   A.  I believe so.

20   Q.  Okay.  If you'll flip over to the next page --

21   A.  All right, sir.

22   Q.  Schedule J --

23   A.  Yes, sir.

24   Q.  -- it gives your monthly living expenses.  And it states

25   your average monthly living expenses is $4,056.83.  Is that

1   correct?

2   A.  Yes, sir.

3   Q.  Okay.  So you have a total net monthly income of $44.02.

4   Is that correct?

5   A.  Pretty much.

6   Q.  Okay.

7   A.  It's real close.

8   Q.  And this was prepared on or about July of 2009 -- with

9   your bankruptcy counsel?

10  A.  Yes, sir.  I don't recall the exact date, but, yes.

11  Q.  Okay.  Well, did you provide information to your

12  bankruptcy counsel to prepare this schedule?

13  A.  I'm sure I did.  I'm sure I did -- just the best I could

14  or remembered, yes.

15  Q.  Okay.  Would this have also been an accurate amount for

16  your monthly income of June 2009?

17  A.  Yes, my pension and Social Security, yes.  That's --

18  Q.  So that's the only income --

19  A.  That stays the same --

20  Q.  -- you had for June of 2009?

21  A.  Yes, I don't -- I didn't -- I didn't take any salary

22  from the business, at all.

23  Q.  Okay.  In May of 2009, would this have been an accurate

24  listing of your income and monthly living expenses?

25  A.  Pretty much, I believe, yes.

1    Q.  Okay.  All right.  Would you next refer to Schedule F --

2    your unsecured creditors?

3    A.  S.

4    Q.  And I'll find that for you.

5    A.  Okay.

6    Q.  It's in the back.

7    A.  Oh.  Oh, this way.  Okay.  Oh, okay.

8    Q.  Now, this Schedule F -- that's a listing -- all of your

9    unsecured creditors --

10   A.  Okay.

11   Q.  -- in your bankruptcy case --

12   A.  Okay.

13   Q.  -- is that correct?

14   A.  Yes, sir, I believe it is.

15   Q.  Okay.  And would you look at the second page on

16   Schedule F and give me the total amount of your unsecured

17   debt?

18   A.  At the bottom, down here?

19   Q.  At the bottom.

20   A.  Thirty-four two fifty-nine?  Is that the one?

21   Q.  That's correct.  Okay.  So when you prepared these

22   schedules, your monthly net income was $44, and you had

23   payments due on mostly credit card debt, it appears, of

24   34,000.  Is that correct?

25   A.  I -- yeah, I guess it is.

1  Q.  Okay.  Do you know what the minimum payments would have

2  been to all these unsecured creditors --

3  A.  No.

4  Q.  -- on a monthly basis?

5  A.  No.

6  Q.  Okay.  Would it have been more than $44 -- to be the

7  minimum payment on these debts?

8  A.  Well, yeah.

9  Q.  Okay.

10  A.  Yeah, we were making all our payments.  We weren't late

11  on any payments.

12  Q.  Okay.  But on your statement of income and expenses,

13  you're showing $44 above living expenses --

14  A.  Okay.

15  Q.  -- yet, you have minimum payments to unsecured creditors

16  that are --

17  A.  Okay.

18  Q.  -- in excess of that amount.  Is that --

19  A.  Okay.

20  Q.  -- correct?

21  A.  Yes, sir, I guess so.

22  Q.  Okay.

23  A.  Let me get this Schedule I out here a minute.  I think

24  some of these expenses you're talking about -- this

25  $44,000 -- something may have included -- I don't think it

1   included our payments on all this stuff or not, see?  Vadis

2   will know that; I don't.

3   Q.  Well, let's look at the -- or let's --

4   A.  I don't know.

5   Q.  -- look at Schedule J, then, again.

6   A.  Schedule what?

7   Q.  J.  Talking about your monthly expenses.

8   A.  Oh, okay.  Let me find that again.  Schedule D, E -- got

9   to be close.  I may you may -- I don't recall, see?  You

10  know, Vadis did all the book work; I didn't do that.  I just

11  did the manual labor.  I --

12  Q.  [Inaudible] --

13  A.  -- J, okay.  Yeah, okay.

14  Q.  All right.

15          MR. VIDMER:  Judge, we'll stipulate to the

16  Schedule J.  We didn't show payments on credit card debt

17  because that was after the bankruptcy was filed and --

18          MR. CRONE:  Okay.  So you're -- all right, that's

19  fine.

20          THE COURT:  Right.  I mean, it shouldn't --

21          MR. CRONE:  So there's a stipulation that there

22  was no --

23          THE COURT:  It shouldn't show anything --

24          MR. CRONE:  -- payments for credit card debt in

25  the expenses.

1          THE COURT:  Right.

2          MR. CRONE:  Okay.

3          MR. VIDMER:  Included in the bankruptcy file, yeah

4     (phonetic).

5          MR. CRONE:  All right.  Okay.

6          THE COURT:  Right.

7     BY MR. CRONE:

8     Q.  All right.  Mr. Turnbow, if you would next turn -- it's

9     on Exhibit 1 again --

10    A.  Yeah, okay.

11    Q.  -- the "Statement of Current Monthly Income and Means

12    Test Calculation."  It's [inaudible].  I'll find it for you.

13    A.  Oh.  This one -- okay.

14    Q.  Okay.  Now, if you'll turn to the second page of that --

15    A.  Right there.

16    Q.  -- "Means Test Calculation," flip over one page and look

17    at Section 4.

18    A.  Okay.

19    Q.  Do you see that?  All right.  You're showing operation

20    of a business; gross receipts, seven thousand nine

21    thirty-one thirty-three; ordinary and necessary business

22    expenses seven thousand nine thirty-one thirty-three.  You

23    see that?

24    A.  Yes, sir.

25    Q.  Okay.  What is this based on?

1    A.  What is that based on?

2    Q.  Yes.

3    A.  The -- I guess what we made from mowing.

4    Q.  Okay.  Made from mowing and expenses for mowing.

5    They're exactly the same?

6    A.  No.  No, the expenses were a whole lot more than the

7    income.

8    Q.  Okay.  So --

9    A.  A whole lot more.

10   Q.  All right.

11   A.  That's why we was using all these credit cards for and

12   used all our savings for.

13   Q.  Okay.  So at the time that your bankruptcy schedules

14   were prepared, based on the last six months, you hadn't --

15   you didn't have any profit from the business?  Is that what

16   you're stating?

17   A.  Yeah, we -- yeah.  We didn't make a profit.

18   Q.  Didn't make a profit.  All right.

19   A.  No.

20           MR. VIDMER:  Judge, if I may interject something

21   here.

22           THE WITNESS:  I mean, this is confusing me.

23           THE COURT:  All right.  If you'll just stand --

24           MR. VIDMER:  On the preparation of the --

25           THE COURT:  -- stand up there, 'cause I can't --

1    MR. VIDMER:  On the preparation of the means test,

2    if your business expenses -- the Best Case software -- if

3    your business expenses exceed your income, it will not allow

4    you to put in a negative number.  So it automatically

5    defaults to a zero amount.

6         THE COURT:  Okay.

7    BY MR. CRONE:

8    Q.  All right.  Mr. Turnbow, if you would turn a few sheets

9    there and get to --

10   A.  Toward the back?

11   Q.  -- documents called "Business Income and Expenses."

12   A.  Just a minute.  "Business Income and Expenses."  Well --

13   oh, this handwritten stuff?

14   Q.  Yes.  Yes.

15   A.  Oh, okay.

16   Q.  Okay.  Do you recognize that?  Is that something you

17   prepared?

18   A.  No, this would --

19        THE COURT:  Are you talking about Exhibit 2?

20        THE WITNESS:  This would be my wife.

21        MR. CRONE:  Exhibit 2, yes.

22        THE WITNESS:  This -- my wife wrote these.  It's

23   her writing.

24   BY MR. CRONE:

25   Q.  Okay.

1    A.   Yes.

2    Q.   All right.  And this was submitted with your bankruptcy

3    petition; is that correct?

4    A.   I suppose it was.  I don't know what all we submitted.

5    We did everything that we could think of --

6    Q.   All right.

7    A.   -- were required to that I --

8    Q.   Okay.  And this first sheet, on Plaintiff's Exhibit 2

9    is -- it says "Gross Monthly Income for January."  And it

10   has three thousand eight twenty-one.  Is that correct?

11   A.   I suppose it is.

12   Q.   Okay.  And then there's a notation at the top of it

13   that -- of that -- one thousand four fifty-one was a deposit

14   to the business account.

15   A.   Yes, sir.

16   Q.   Okay.  So did you deposit some money out of a personal

17   bank account into the business --

18   A.   Yes.

19   Q.   -- bank account?

20   A.   I surely did --

21   Q.   Okay.

22   A.   -- in order to make all our payments.

23   Q.   All right.  And your total expenses were four thousand

24   nine fifty-six; is that correct?

25   A.   I guess.  My wife would -- could answer that correctly;

1    I can't.

2    Q.  Well, this is your business.

3    A.  But I'll take her word for it, here.

4    Q.  Okay.  Okay.  So you had a loss for January of one

5    thousand one thirty-five.  Correct?

6    A.  Yes, sir.

7    Q.  Okay.  Flip over to the next sheet --

8    A.  All right.

9    Q.  -- and we got February.  And your gross monthly income

10   for February shows eight thousand three eighty fifty.

11   A.  Okay.

12   Q.  And you transferred some more money, evidently --

13   forty-one hundred dollars.

14   A.  Yes, sir.

15   Q.  Is that correct?

16   A.  Yes, sir.

17   Q.  Okay.  So your total money in the business for February

18   was twelve thousand four --

19            THE COURT:  Mr. Crone --

20            MR. CRONE:  -- eighty-fifty -- yes.

21            THE COURT:  Mr. Crone, just one second.

22            MR. CRONE:  Yes.

23            THE WITNESS:  Okay.

24            THE COURT:  Thank you.  You may proceed.

25            MR. CRONE:  Technical problems?  Okay.  Okay.

1    BY MR. CRONE:

2    Q.  So your total gross receipts and money that you put into

3    the business for February was twelve thousand four eighty

4    fifty; is that correct?

5    A.  Oh, yes, sir.

6    Q.  Okay.  And your total expenses for that month was

7    fourteen thousand five ninety-four.

8    A.  Yes, sir.

9    Q.  Okay.  So you, again, had a loss --

10   A.  Yes, sir.

11   Q.  -- two thousand one thirteen.

12   A.  Yes, sir.

13   Q.  All right.  Let's look at March -- the next sheet.

14   A.  Okay.

15   Q.  Gross monthly income for March -- and I assume we're

16   talking about 2009 for all these.  For March is -- looks

17   like you had an $8,000 personal deposit --

18   A.  Uh-huh.

19   Q.  -- eleven thousand five sixty of receipts --

20   A.  Yes, sir.

21   Q.  -- for nineteen thousand five sixty -- for total income

22   and money put into the business for March; is that correct?

23   A.  Well, what's that, now?  I'm sorry.

24   Q.  So you had a total of nineteen thousand five sixty going

25   into --

1    A.   Oh, yes --

2    Q.   -- this lawn-care business?

3    A.   -- up here, at the top, yes.  I was looking at the

4    bottom.

5    Q.   Okay.  Okay.

6    A.   Yes, sir.

7    Q.   For January, February, and March, what kind of business

8    would you be doing in a lawn-care business?

9    A.   Snow removal and -- and if this was 2009, this was when

10   all the tress fell -- the ice storm.  And so, for the

11   customers we had, we would go and try to trim up their trees

12   and clean up their mess and --

13   Q.   All right.

14   A.   -- you know.  And then we had a -- I think we had maybe

15   one annual customer that paid us through the winter when we

16   did snow removal, you know.  But it was basically snow

17   removal or cleaning up the lawns for people that had the

18   limbs.

19   Q.   Okay.  So for the first quarter of 2009, would that have

20   been unusually good -- as far as business?  Because the ice

21   storm and other matters?

22   A.   No, it'd be extremely poor.

23   Q.   Pardon me?

24   A.   In -- for normal conditions -- talking about January,

25   February --

1    Q.  Yes.

2    A.  -- and March?  No.  No.  Normally, in January, February,

3    and March, there's not much going on.

4    Q.  Okay.  But in January, February, March of 2009, you had

5    a little more going on than normal; is that correct?

6    A.  Yes, because of the ice storm.

7    Q.  Okay.  Okay.  But you still had expenses of twenty-

8    thousand eight twenty-eight --

9    A.  Yes.

10   Q.  -- and a loss.

11   A.  Yes, sir, our payments were still going.

12   Q.  Okay.

13   A.  So they didn't stop in January, February, and March.

14   Q.  You're still spending more than you're making, even

15   though --

16   A.  That's right.  Very foolish on our part, but that's the

17   reason we're here today, I guess.

18   Q.  All right.  Okay.  Let's look at April.

19   A.  Shorten (phonetic) this up.

20   Q.  April -- gross monthly income --

21   A.  Okay.

22   Q.  -- Seven thousand seven sixty-seven fifty.  And looks

23   like you had a $5,000 loan from National City Bank -- is

24   that correct?

25   A.  A what?  A seven thousand --

1    Q.  At the very top, it says --

2    A.  Yeah, well --

3    Q.  -- $5,000 loan.

4    A.  Five -- yes.  That's right.

5    Q.  Okay.  So you put another 5,000 in, and you made seven

6    thousand seven sixty-seven fifty --

7    A.  Yes.

8    Q.  -- for total money of twelve thousand --

9    A.  Uh-huh.

10   Q.  -- seven sixty-seven fifty for April?

11   A.  Uh-huh.  Are you seeing where the expenses -- what's

12   causing this, or are you just looking at totals?

13   Q.  Well, I'm just looking at totals.

14   A.  Right.

15   Q.  Okay.

16   A.  See, I had to look at the whole picture.

17   Q.  Okay.  Well, what -- your total expenses were seven

18   thousand nine sixty-five for that month; is that correct?

19   A.  Okay.

20   Q.  Okay.  So you had another loss -- of one ninety-seven

21   fifty?

22   A.  Yes, sir.

23   Q.  Okay.  On May.

24   A.  Go on again, now?

25   Q.  Going to the next page.

1    A.  May, okay.

2    Q.  Gross monthly income of eight thousand four oh eight.

3    Is that correct?

4    A.  Okay, yes.  That's what it shows.

5    Q.  Okay.  And you had expenses of six thousand two

6    eighty-three; is that correct?

7    A.  Yes, sir.

8    Q.  So you had a profit for this month of --

9    A.  Yes.

10   Q.  -- two thousand one twenty-five?

11   A.  Sure did.

12   Q.  Okay.  Let's look at June.

13   A.  Okay.

14   Q.  You have gross monthly income of seven thousand six

15   fifty-one.

16   A.  Yes, sir.

17   Q.  And total expenses seven thousand seventy fifty -- for a

18   loss of nine thousand four nineteen fifty.

19   A.  Okay.

20   Q.  Is that correct?

21   A.  Probably.

22   Q.  Okay.  So you had, for the six months -- January through

23   June of 2009 -- you had losses of -- every month except for

24   one.

25   A.  Right.

1    Q.  Right?

2    A.  Uh-huh.

3    Q.  Okay.  Mr. Turnbow, would you now turn to Plaintiff's

4    Exhibit 3?  You should be looking right at it, if you turn

5    the page.  You see that?

6    A.  Yes, sir.

7    Q.  Okay.

8          THE COURT:  Mr. Crone, may I ask a question?  Is

9    he really your best Witness, or would you rather put on

10   Mrs. Turnbow and then reserve him for any other questions?

11   What would you rather do?

12         MR. CRONE:  I'd rather complete my --

13         THE COURT:  Okay.

14         MR. CRONE:  -- complete his testimony, Your Honor.

15         THE COURT:  Right.

16   BY MR. CRONE:

17   Q.  All right.  Mr. Turnbow, Plaintiff's Exhibit 3 -- that's

18   a statement from Chase Bank, and it has various activity on

19   that account, from May 28, up until even after the time you

20   filed for bankruptcy.  And this account is just in your

21   individual name; is that correct?

22   A.  The Chase card?

23   Q.  Yes.

24   A.  Yes, sir.

25   Q.  Okay.  And you've had that account since 1994, I

1    believe, haven't you?

2    A.  Well, that's -- I didn't recall the date, but if you say

3    so.

4    Q.  You've had it for awhile?

5    A.  I've had it for a long time, yes.

6    Q.  Okay.  All right.  There's a transaction on there, on

7    May 28, 2009, to Williams Lawn Garden for $945.60.  What was

8    that?

9    A.  I'm sure it was for some repairs to our equipment, but I

10   don't know, offhand, what it was for.  They were in and out

11   of the shop quite a bit last year.

12   Q.  Okay.  On June 11th of 2009, Plaza Tire Service, of

13   eight ninety-six seventy-six.  Would that be purchase of

14   tires?

15   A.  Yes, sir, for the trailer.

16   Q.  Okay.

17   A.  I believe it was for one of the trailers or the pickup

18   truck.  I don't know which -- tires.

19   Q.  Okay.  And then, on June 18, 2009, McAlpin's Small

20   Engines, eight thousand twelve fifty-four.

21   A.  Right, that was for the lawnmower that's in question

22   today.

23   Q.  Okay.  What kind of lawnmower was that?

24   A.  It was a EverRide.

25   Q.  An EverRide.

1    A.   Yes, sir.

2    Q.   Okay.  And --

3    A.   Because -- do I -- well, I'll just wait.

4    Q.   Well, and I believe your attorney said, in opening

5    statement, you no longer have this mower.

6    A.   Yeah.  They took -- yes.  I had two mowers --

7    Q.   Okay.

8    A.   -- two EverRide mowers.

9    Q.   Uh-huh.  Okay.

10   A.   Now, do I --

11   Q.   So --

12   A.   Do I tell him about that, or what?

13   Q.   The mower that you bought from McAlpin's -- that has

14   gone to another creditor?

15   A.   I bought two mowers from McAlpin's.  The bank has one,

16   and I have one.  I bought one with my own personal money --

17   for my yard; then I bought this one for the business.  They

18   were using my personal mower because one of them was in the

19   shop -- with the clutch worn out -- which we had to order --

20   and -- or -- and one had the deck -- they had to order a new

21   deck for it.  They said the deck's bent.  So we had two

22   mowers in the shop; they were using my personal mower; we

23   were still doing the best we could do to keep this business

24   alive.  Very foolishly, I'll say, but we were doing it.  So

25   I went and purchased another EverRide mower.  When the bank

1   came and got all their stuff, they said, "Hey, your personal

2   mower -- we want it -- and we want everything else you've

3   got."  So they -- I don't know what all they took.  They

4   did -- they had a list, but I never saw the list.  I've

5   never seen the list.  I've had no contact with them,

6   whatsoever, since the date of filing.

7   Q.  Okay.  But you said you bought two EverRide mowers.

8   A.  I bought one on this credit card, and I had one, the

9   year before, that I bought with my personal money -- 'cause

10  I sold my pickup truck --

11  Q.  Okay.

12  A.  -- and bought a mower for my yard.

13  Q.  And you still have one of the EverRide mowers --

14  A.  Yes, sir.  Have one --

15  Q.  -- at your home.

16  A.  Huh?

17  Q.  At your home?

18  A.  Yes, sir.

19  Q.  Is --

20  A.  Well, today it's not at my home.  My daughter-in-law's

21  using it today because she's got a mower broke down.

22  Q.  Oh --

23  A.  I loan it to her, occasionally, if she has one that's

24  broke down.  But it's -- yes, it's --

25  Q.  Do you use that EverRide mower to mow your yard?

1   A.   I mow three acres.

2   Q.   Okay.  Where you live?

3   A.   Yes, sir.  I own three --

4   Q.   Okay.

5   A.   -- and a half acres, actually, but take out a half acre,

6   with the house and the garage and the driveway.

7   Q.   All right.  And you said that the bank that had the

8   equipment loan with your business repossessed all of our

9   equipment, including the EverRide mower that you charged on

10  the Chase account.

11  A.   That I did what, now?

12  Q.   This mower, from McAlpin's Small Engines --

13  A.   Yes.

14  Q.   -- $8,012.54 --

15  A.   Yes.

16  Q.   -- that was repossessed?  That mower?

17  A.   Yes.  They took the wrong one.

18  Q.   What do you mean -- they took the wrong one?

19  A.   Okay, I just got through telling you we had two.  Okay?

20  So I had a bagging system on mine.  It's an '08; this one

21  was an '09.  Okay?  The mower in question was a 2009.  My

22  mower -- I sold my diesel pickup truck and bought me a 2008

23  mower when we bought our property, in Lawn Oak (phonetic),

24  for my personal yard.  When they came to get the stuff, I

25  was in Murray, Kentucky; my son was at my house.  They said,

1    "We'll be there in two hours, and we want the stuff."

2            He called me.  By time I could get from Murray to

3    the lake to get to my truck and get back to Mayfield, they

4    had a trailer loaded, a truck hooked to it.  They had

5    another truck over there with stuff loaded.  They had a list

6    they was going over with my son -- kind of sort of.  And I

7    went over to look.  Well, that list just -- they did not

8    speak to me or show me a list of what they wanted, what they

9    took.  All I know is they had Weedeaters, blowers, my

10   personal Weedeater -- that I'd had from when I sold this

11   business, back in oh -- whenever it was the first time.  I

12   bought a Weedeater for my home -- a little homeowner.  I

13   bought a little backpack blower for my home.  They took

14   that -- because they were allowed to by the -- if -- our

15   attorney said they can take what they want.  And so they

16   took it.

17           Well, they got the wrong mower.  They got the one

18   with -- the new one, which did not have the bagger system on

19   the back.  They should have gotten that one, with the

20   bagger, and I would have had the '09, which is the one we're

21   talking about.  Okay?  But the bank has the '09, and I have

22   the '08.

23   Q.  Okay.

24   A.  Okay?  So that's how that came about.  One, I had paid

25   for, with my money -- out of my pocket -- in 2008.  And then

1   that's --

2   Q.  Okay.

3   A.  Okay?  I mean, I'm trying to be smart with you, but, I

4   mean, that's -- it's a --

5   Q.  Okay.  Well --

6   A.  -- screwed up mess.

7   Q.  -- Mr. Turnbow, you testified, previously, in looking at

8   your business income and expenses, that, in June, you had a

9   $9,400 loss; is that correct?

10  A.  Okay.  Why, yes, sir.

11  Q.  Yet, on June 18, 2009, you go out and spend $8,000 for a

12  new mower.

13  A.  Right, because we had one mower in operation at that

14  time -- mine.

15  Q.  When you say mine, you're talking about the other

16  EverRide?

17  A.  I'm talking about the EverRide, yes, sir -- my mower.

18  Q.  Okay.

19  A.  Well, it was all mine, I guess, with the business, but

20  I'm talking about personal mower.  We had one in the shop;

21  we had to get a new deck for it, 'cause -- well, it was

22  cutting crazy.  We used it awhile like that -- 'cause it was

23  cutting different levels.  And we took it to McAlpin's.

24  They looked at it, put some washers under the blade, said,

25  "That'll take care of it."  Well, it didn't.  So then we

1    took it back to the Toro dealer at Metropolis, where we had

2    purchased it, originally, in '03.  The Toro mowers are '03s.

3    Got over a thousand-some-odd hours.  Should have replaced

4    them a long time ago but couldn't afford it.  So there's

5    where a lot of our expenses come out -- twenty-five hundred

6    dollar mower deck.  There was something, you know, a lot of

7    expenses here, like -- and fuel prices went up -- and just

8    everything, you know.

9           And I guess you could say I'm stupid, but

10   foolishly trying to keep it going because this -- the Court

11   doesn't want to hear -- you don't either, but I just wasn't

12   raised to do this.  I was raised to do whatever.  So I

13   spent -- a lot of this money is out of my savings.  I spent

14   it all.  And then the credit cards -- you included -- or

15   you -- whoever -- your client and all the others -- we

16   weren't late on anything because I was using my personal

17   money to make sure we were not late on the payment -- 'til

18   we got to the one time that we were, like, a week or so

19   late, or whatever -- a few days on the one to the bank.  And

20   that's when they called us, and everything started taking

21   place.

22          We used all of our savings.  And we used credit

23   cards 'til we started getting letters from them saying,

24   "You're not maxed out, but we're not going to loan you any

25   more money -- 'cause we think you've got this."  So there we

1    were.  We had to use credit cards for fuel, for belts, for

2    blades, for tires -- for all kinds of things -- because we

3    had spent our savings -- out of our savings account.  We'd

4    spent it --

5    Q.  Okay.

6    A.  -- and was taking --

7    Q.  Mr. Turnbow --

8    A.  So, you know --

9    Q.  -- again, for -- from January through June --

10   A.  Yes.

11   Q.  -- you have losses every month.

12   A.  Yes.

13   Q.  And look at your -- looking at your 2008 tax returns,

14   you had a profit, in 2008, of about $159 from the business.

15   A.  I know.  Very foolish business on my part, wasn't it?

16   Q.  And how did you intend to pay for an $8,000 mower then?

17   A.  Well, at the time, we were still caught up on all our

18   payments.  And to be honest with you, I don't know.  I must

19   have had a brain wave at that time; but I was down to using

20   my personal mower, and we still had 12, 14 customers,

21   whatever -- 16, at that time, 'cause we had grown, just a

22   little, from when I got it back.  The young man that bought

23   it from us had lost 85 or 90 percent of our customer base --

24   Q.  Okay.

25   A.  -- so we were rebuilding.

1   Q.  Well, Mr. Turnbow -- I'm sorry to interrupt you, but --

2   A.  Just foolish business on my part.

3   Q.  But, I mean, is it your testimony that, on June 18,

4   2009, when you bought this mower, you didn't know how you

5   were going to pay for it?

6   A.  Well, I -- no, I knew how I'd pay for it.  I just -- the

7   same way I had been paying for it -- out of my own money --

8   until we've had -- finally wind up saying, "Well, it's

9   gone."  So I -- yeah, I can say I had intentions of paying

10  for it, yes.  I, you know, there are a lot of assumptions

11  and a lot of thinking, saying, "Well, this was all done

12  'cause he knew they was filing," and all that.  Well, I had

13  no intention of filing bankruptcy at the time I did this.

14  I -- you know, Vadis was taking care of the finances.  But I

15  had no intentions of filing bankruptcy.  I've never had that

16  intention -- until it happened that we were broke and had no

17  more credit.

18  Q.  Okay.

19  A.  And then, all of a sudden, we were in trouble.

20  Q.  Mr. Turnbow --

21  A.  Due to mismanagement, or whatever.

22  Q.  -- do you get -- where do you get the most money from

23  your lawn business?  Is it from mowing?

24  A.  Yes.

25  Q.  Okay.

1   A.   That's -- yes, that --

2   Q.   Now, isn't most of the mowing done in the spring, rather

3   than the summer?

4   A.   Well, no, we mow through the summer.  There might be

5   a -- there'd be -- it slows down, sometimes, in July or

6   August, when it doesn't grow as much, yes.

7   Q.   Well, I'm going to speak from my personal experience.

8   A.   Oh, I'm sorry.  I'm --

9   Q.   I mean, in the spring, I usually mow a lot.

10          MR. VIDMER:  Judge, I want to object to the

11   testimony --

12          MR. CRONE:  Sometimes --

13          THE WITNESS:  Yeah, the spring you do -- you do

14   more.

15          MR. VIDMER:  -- by Mr. Crone.

16          THE WITNESS:  Yeah.

17          THE COURT:  I'm sorry?

18          MR. VIDMER:  I'm going to object to Mr. Crone's

19   testimony --

20          THE COURT:  Well, you need to -- I want you to --

21          MR. VIDMER:  -- unless he wants to be sworn in.

22          THE COURT:  Okay.  Wait, wait, wait.  You need to

23   stand up on that podium when you talk --

24          MR. VIDMER:  Objecting to Mr. --

25          THE COURT:  -- because I can't see you, right

1    here.

2              MR. VIDMER:  Oh, okay.  I was objecting to Mr.

3    Crone's testimony as to -- unless he wants to be sworn in

4    and testify.  It's --

5              MR. CRONE:  I'll rephrase the question, Your

6    Honor.

7              THE COURT:  All right.

8    BY MR. CRONE:

9    Q.  Mr. Turnbow, in -- when does grass grow the fastest?

10   A.  When does grass grow faster?

11   Q.  Yes.

12   A.  Right after it rains.

13   Q.  Well, does it grow faster in April and May or in June,

14   July, and August?

15   A.  Well, I would say it grows faster in -- depending upon

16   the weather conditions; but it would grow faster in the

17   spring than in the summer.

18   Q.  Okay.  So --

19   A.  Faster, yes.

20   Q.  -- you're -- in June of 2009, you're coming upon the

21   time when mowing slows down -- somewhat -- and you go out

22   and buy a new mower.  Is that correct?

23   A.  It slows down a little; but we still mow once a week for

24   our customers, same as we do in April.  We mow it in July,

25   once a week, unless we have had a drought.  And then maybe

1  we'll skip a week, you know.  But I'd say it slows down a

2  little, but not just drastically, no sir.

3  Q.  Okay.

4  A.  Do you mow your yard in July?

5  Q.  Not very often.

6       MR. CRONE:  He asked me the question, Your Honor,

7  so I answered it.

8       THE WITNESS:  Well, you know, you're trying to pin

9  me down there, I'm just, you know --

10      THE COURT:  Let's keep track -- and, by the way, I

11  want to go back and correct one thing, Mr. Crone.  You did

12  say that the loss of business every month from January

13  through June, but it seems, when I looked at the May, there

14  was an actual -- actually a profit in May --

15      MR. CRONE:  There was a profit of $190-some-odd

16  dollars.  I -- if I said every month, then I was incorrect.

17      THE COURT:  Well, wait, wait.  You need to look at

18  that again.  Look at May.

19      MR. CRONE:  Excuse me, two thousand one

20  twenty-five.

21      THE COURT:  Okay.

22      MR. CRONE:  Yes.

23      THE COURT:  All right.

24      MR. CRONE:  For one month.

25      THE COURT:  All right.

1    BY MR. CRONE:

2    Q.   All right.  Mr. Turnbow, on July 3, 2009 --

3    A.   July, just a minute.  Let me find July.  June -- uh-oh.

4    Q.   Well, if you're looking at -- are you looking at

5    Plaintiff's Exhibit 3?

6    A.   Is July the --

7    Q.   It'd be on the second page, towards the bottom.

8    A.   I've got June.  Would the next page be July?  Would this

9    be July?  Where would July be?  Here's June.

10   Q.   [Inaudible], right here.

11   A.   Oh, is that July?  Okay.  I didn't -- I -- okay, thank

12   you.

13   Q.   Well, I think it's actually a running total, but --

14   A.   Eight -- that's --

15   Q.   Okay.

16   A.   -- that's August.

17   Q.   If you look towards the bottom of the page, you'll see a

18   figure of $650.  Do you remember that transaction?

19   A.   Yes, sir, I certainly do.

20   Q.   Okay.  That was a convenience check or some type of

21   check that you wrote off of the Chase account, is that

22   correct?

23   A.   Do what, now?  Is what?

24   Q.   Well, you tell me.

25   A.   I'm sorry, I --

1    Q.   What was the $650 for?

2    A.   Okay.   That was in August.   Well, this thing says

3    8-12-09.   Is that -- is it August or July?   Let me see where

4    it is here.   July.

5    Q.   All right.

6    A.   Three July '09?

7    Q.   July 3 of '09.

8    A.   That was for my personal use because I had to -- we had

9    four trees blow down when -- an ice storm in my yard.   Okay?

10   So we kept dragging and dragging, and I hired a fellow that

11   I -- what you call an arborist -- arborist -- to come in and

12   trim up the trees that were remaining standing.   And I had

13   to pay him to do that, and I didn't have that kind of money

14   available at the moment.   That's what that's for.   Yes, sir,

15   that was for my -- to get my lawn cleaned up.

16   Q.   And this was ten days before you went to see an attorney

17   about filing bankruptcy, is that correct?

18   A.   I suppose it was; but it was still ten days before -- I

19   didn't go see an attorney for bankruptcy until the day

20   before I went.   I finally gave up.   We fought this thing all

21   the way through, you know.   I mean, that's -- I understand

22   all the assumptions and the thoughts that everyone has --

23   that we had planned all this, but we hadn't --

24   Q.   All right.

25   A.   -- you know.

1    Q.  I'm next going to refer you to --

2    A.  Okay.

3    Q.  Plaintiff's Exhibit 4 --

4    A.  Four?  Okay.

5    Q.  -- and this would be statements from a -- member

6    statements from your checking account with C-Plant Federal

7    Credit Union.

8    A.  Okay.  Oh, so you got my credit union report, huh?

9    Q.  And if you will look at the statement from July 1, 2009,

10   to July 31, 2009 --

11   A.  Just a minute.  July.  That would be -- seven -- well,

12   okay, July what, now?

13   Q.  July 1, 2009, to July 31, 2009.

14   A.  Okay.  Seven oh one to July 31st, okay.

15   Q.  You see that?  Okay.

16   A.  Those three pages, here?  Yes.

17   Q.  Yes.  Now, you go down the column of credits and you see

18   a $650 deposit made on July 2, 2009.  Do you see that?

19   A.  Okay.  Okay.

20   Q.  Do you see that?

21   A.  Yes.

22   Q.  Is that that same check that you got from Chase?

23   A.  Yeah -- no, that -- we borrowed the -- we had to get the

24   money from the credit card, and then we had to put it in the

25   bank so I would write this -- pay this gentleman.

1    Q.   Okay.  And that was done on the --

2    A.   That was the best I recall the time.  And, you know,

3    some of these times I can't recall, exactly.

4    Q.   And that was done on July 2, 2009?

5    A.   I suppose that --

6    Q.   Okay.

7    A.   I suppose so, yes.

8    Q.   And look to the right of the $650 deposit.  Just above

9    that, it shows a balance of $4,003.45, is that correct?

10   A.   Right.  Oh, yes.

11   Q.   So you had a balance, on July 2, prior to depositing the

12   650, of $4,000.  Is that correct?

13   A.   Yes, sir.  Yes, sir.

14   Q.   Well, why didn't you use some of that money to pay the

15   contractor?

16   A.   Okay.  Let me see if I can work this where it'll be

17   acceptable.  We have, in our checking account, the

18   whatever -- 4,000-something dollars, okay?  Because we don't

19   get our -- all our income doesn't come all at one time.  I

20   get a retirement one week, Social Security, and then Vadis

21   gets a retirement and Social Security.  So it comes a little

22   at a time.  And so we -- at the end of the month, whenever

23   all this comes in, we start writing all our bills.  Okay?

24   So, at this time, it could have been just at the time --

25   right -- this is '02, right -- the second day?  So we still

1    have had, left over from June, all our income, to where we

2    could -- we made our payments.  Okay?

3    Q.  Okay.

4    A.  Follow me?  We had checks outstanding that hadn't, you

5    know, hadn't--don't come in and show here -- because they

6    were written to the home -- house payment and the car and

7    utilities and our normal monthly bills -- because our check

8    doesn't come the first day of the month; it comes -- four

9    times a month, we'll get a pension and a -- the Social

10   Security, a pension, and Social Security.

11   Q.  All right.  Mr. --

12   A.  And so, at the first of every month, we're going to show

13   about 4,000 or so dollars.

14   Q.  Okay.  And if you'd look on page three of that statement

15   that we're looking at --

16   A.  All right.  Page three.

17   Q.  -- on July 31, what was your balance in this account?

18   A.  I don't know -- July 31.

19   Q.  Yes.

20   A.  Where's it show?  I don't know -- $4,136?  Is that

21   what -- or, no, it -- took that out, took that out.  I don't

22   know what -- what number are you looking for?

23   Q.  I see four thousand one thirty-six seventy-two --

24   A.  Okay.

25   Q.  -- as an ending balance.

1    A.   Yeah.

2    Q.   Okay.  So that's even more than the balance was on July

3    2; is that correct?

4    A.   'Cause we had -- if you'll notice, there was an advance

5    in here -- put in here of $2,000.  That boosted that up --

6    that -- you know, credits, whatever -- I don't understand

7    all this bookkeeping stuff.

8    Q.   Well, what was the advance from?

9    A.   I don't know.

10   Q.   You don't know.

11   A.   My wife knows.  She can tell you.

12   Q.   Okay.

13   A.   She does the bookkeeping.

14   Q.   But even without the advance, you have $2,645; is that

15   correct?

16   A.   That may have been -- oh, that came out of our -- that

17   came -- that was a loan.  That was a personal loan -- from

18   the credit union.  Three one nine seven eight oh -- it's a

19   loan -- four zero.  I can get a certain amount on my

20   signature.  Okay?  A loan -- that --

21   Q.   Mr. Turnbow, do you recall the balance in your -- in

22   this credit union account when you filed the bankruptcy

23   petition?

24   A.   No, I don't.  I certainly don't.

25   Q.   Well, let's go back and look at Exhibit 1.

1   A.  Back on the first page, you're talking about?

2   Q.  Exhibit 1 --

3   A.  Okay.

4   Q.  -- and this will be Schedule B.

5   A.  Schedule what?

6   Q.  Schedule B, your assets.

7   A.  Just a moment.  Schedule D.

8   Q.  B.

9   A.  Let me find that.

10          THE COURT:  Mr. Crone --

11          MR. CRONE:  Yes.

12          THE COURT:  -- go find it for him.

13          MR. CRONE:  I'll find it for him.

14  BY MR. CRONE:

15  A.  Schedule D.  Schedule D.  I've gone too far?

16  Q.  [Inaudible].

17  A.  Oh, yes, I see a Schedule B, "Personal Property."

18  Q.  There we go.  That's it.

19  A.  B?  Oh, I'm sorry.  Okay, I thought you said D.  I'm

20  sorry.

21  Q.  And section number two has --

22  A.  Okay.

23  Q.  -- "Checking and Bank Accounts."

24  A.  Okay.

25  Q.  And it shows the C-Plant Federal Credit Union.  I assume

1   that's the bank account we've been talking about.

2   A.  Yes, sir, that's where we do our banking.

3   Q.  And that shows a balance of forty-one thirty-six

4   seventy-two.  Is that correct?

5   A.  Well, that's what that shows.

6   Q.  Okay.

7   A.  What date is this?

8   Q.  Your petition was filed on July 31, so I assume it was

9   on or about that time.

10  A.  I'm just wondering what date this is.  This is July of

11  '09?  Right?

12  Q.  It was filed on July 31 of '09.

13  A.  Okay.

14  Q.  All right.

15  A.  Okay.

16  Q.  All right.  Mr. Turnbow, you have reaffirmed several

17  debts.

18  A.  Yes, sir, we reaffirmed some.

19  Q.  Okay.  One is with the credit union, on a 2005 Nissan

20  Titan truck?

21  A.  Yes, sir.

22  Q.  Okay.  What's your monthly payment on that debt?

23  A.  Oh, me.  Well, Vadis knows all those payments.  I might

24  be telling you wrong.  She knows.  She could call it off,

25  probably, right off her head.

1    Q.  Okay.  And --

2    A.  I'm not sure.

3    Q.  -- you've also reaffirmed a debt with the credit union

4    on a Tracker aluminum boat.  Is that correct?

5    A.  Yes, sir.

6    Q.  Okay.  You still have that boat?

7    A.  Yes, sir.

8    Q.  And you reaffirmed on your mortgage with Countrywide?

9    A.  Yes, sir.

10   Q.  And you reaffirmed on another vehicle -- a 2008 Nissan

11   Altima; is that correct?

12   A.  That's right.  That's her car, yes, sir.

13   Q.  All right.  Now, as far as your assets in your

14   bankruptcy petition, you -- looks like you have a life

15   insurance cash value of about $6,000?

16   A.  Uh-huh.

17   Q.  Still have that?

18   A.  Yes, sir.  That's from the plant.

19   Q.  Okay.  And you have firearms and camera equipment --

20   nineteen hundred and seventy-five dollars?

21   A.  Yes, sir.

22   Q.  You have a 401k with Edward Jones, with a balance of

23   nearly $36,000?  Is that correct?

24   A.  Not anymore.  Not anymore.

25   Q.  Okay.

1   A.  We've had to take out of that several times.

2   Q.  Okay.  What's the balance, right now?

3   A.  About twenty -- maybe twenty-three, four, five thousand

4   dollars -- something like that.

5   Q.  Okay.  But at the time you filed bankruptcy, you had

6   36,000 -- approximately?

7   A.  Yes, sir -- approximately, yes, sir, I'd say

8   approximate, yes.

9   Q.  All right.  So you've reaffirmed most of your secured

10  debts; you have a lot of assets that you've exempted, but

11  you're asking the Court to discharge your unsecured debts.

12  Is that correct?

13  A.  Say it again, I'm sorry.

14  Q.  All right.

15  A.  Say it one more time.

16  Q.  You've reaffirmed most of your secured -- about all of

17  your secured debts; you have a lot of assets that you're

18  coming out of this bankruptcy with, and, yet, you're looking

19  to discharge the debt to Chase Bank, is that correct?

20  You're asking the Court to absolve you of paying the debt to

21  Chase Bank.

22  A.  I really didn't know what I was asking this Court to do

23  on this.  I'm here to find out what negotiations you and my

24  attorney have discussed or haven't discussed.  We haven't

25  really talked a lot about this.

1    Q.  All right.  But, actually, prior to filing the

2    bankruptcy petition, you really had the means to pay this

3    debt in full -- if you'd liquidated some assets, correct?

4    A.  Well, if I'd -- well, I could have sold my boat, but

5    it's not worth what I owed on it.  That's -- we checked on

6    that.  I could sell my truck.  And then, time I pay it off,

7    I'd be lucky to sell it for what it -- I owe on it

8    (phonetic).  My wife's car -- we could sell the car and

9    might get what we owe on it.  Not going to sell my house.

10   I'm not being smart with you.  I have no disrespect to this

11   Court or you, either, but I ain't selling my house for a

12   lawnmower.

13          Now, I could sell those things, but I'd lose money

14   on them; I'd still owe for them.  I could sell my deer

15   rifles and my gun safe and my camera; but they wouldn't

16   amount to nothing.  I mean, I've got assets I can sell, but

17   I owe as much or more than what they'll bring.  I -- so I

18   don't know -- I don't know what to tell you.  I mean,

19   it's --

20   Q.  Okay.

21          MR. CRONE:  Your Honor, I have no further

22   questions.

23          THE COURT:  All right.  Mr. Vidmer?

24          MR. VIDMER:  Yeah, a few questions for Mr.

25   Turnbow.

CROSS EXAMINATION

BY MR. VIDMER:

Q. Chad?

A. Yes, sir.

Q. You were --

        THE COURT:  You -- is your cell phone on?

BY MR. VIDMER:

Q. You were current on all your bills through June of 2009; is that correct?

A. Yes, sir, I was.

Q. And this loss on -- in June of 2009 includes inventory purchases, including raw materials of 99 -- $9,999.  Is that correct?

A. Uh-huh.

Q. And is that -- include the EverRide mower?

A. That --

Q. Or do I have to ask Vadis about that?

A. You'd probably need to ask her about that.

Q. Okay.

A. She kept up with the finances more than I did on this.

Q. Okay.

A. You know, I really never saw a list of what they wanted --

Q. Okay.

A. -- and I never saw a list of what they got.

1   Q.  Okay.

2   A.  And I know they have sold some of it since then, and I

3   don't -- never had a list of what they sold.

4   Q.  Mr. Crone made a lot of your C-Plant Federal Credit

5   Union.  You would start the month with a $4,000 balance; you

6   would start the next month with a $4,000 balance.

7   A.  Yes, sir.

8   Q.  And when you started the month with a $4,000 balance,

9   you testified that you paid all your bills at the end of the

10  month.  Is that correct?

11  A.  That's correct.  We did.

12  Q.  So if you pay your bills on the last day of the month --

13  or the next to the last day of the month --

14  A.  Yeah.

15  Q.  -- and they amount to close to $4,000, that really

16  leaves you with little in the bank on that date.  Is that

17  correct?

18  A.  That's correct.

19  Q.  And it just keeps rolling over.  I mean, he showed a

20  $4,000 balance at the end of the month.

21  A.  Yes, sir.

22  Q.  That's because you had -- the funds had been replenished

23  your retirement, your Social Security --

24          MR. CRONE:  Your Honor, I object to the -- the

25  leading.

1          THE COURT:  Rephrase your question.

2          MR. VIDMER:  Well, I'm -- you know, it was -- I'm

3    sort of on cross examination here, Judge.  This is --

4          THE COURT:  Right, but maybe take it one question

5    at a time, Mr. Vidmer.

6          MR. VIDMER:  Oh, okay.  All right.  Okay.

7    BY MR. VIDMER:

8    Q.  So, basically, you were paying your bills at the end of

9    the month --

10   A.  Yes.

11   Q.  -- correct?

12   A.  Yes, correct.

13   Q.  And those checks would not be -- would not come into the

14   bank immediately, would they?

15   A.  No, sir, we would -- no sir.  They don't go through the

16   day you write them.  You mail them, and it's --

17   Q.  Right.

18   A.  -- awhile before they're posted and all.

19   Q.  Okay.  And, eventually, they would come out of the --

20   A.  But --

21   Q.  -- bank account during the month.

22   A.  Yes, they would.  Yes, they would.

23   Q.  And then your funds would be replenished throughout the

24   month --

25   A.  Yes, sir.

1   Q.  -- with your retirement?

2   A.  Yes, sir.

3   Q.  Right.  This Chase credit card -- do you remember when

4   you applied for it in 1994, according -- to Mr. Crone?

5   A.  No, sir.  We, you know, you get these things in the mail

6   all the time.  And, evidently, we must have gotten one and

7   did -- filed the paperwork and applied for the credit card.

8   Q.  Okay.  Do you recall -- at the time when you applied for

9   that credit card, did you make any representations to Chase

10  that you were not going to use this for any business

11  expenses?

12  A.  No, sir.

13  Q.  Okay.  The two EverRide mowers -- you bought one in

14  2008 --

15  A.  Yes, sir.

16  Q.  -- and that was strictly for your personal use.

17  A.  Yes, it was.

18  Q.  Okay.  You bought another in 2009 -- with the Chase

19  credit card -- for business use.

20  A.  Yes, sir.

21  Q.  You retained the one -- you kept the -- you've still got

22  the one -- your personal one.

23  A.  Yes, sir, I've still got the 2008.  Yes, sir.

24  Q.  And you had to fight with City National over that, but

25  you got to keep that one.

1    A.  Yes, sir.

2    Q.  And the 2009, that you bought with the credit card, went

3    back to City National.

4    A.  Right.

5    Q.  Okay.

6    A.  I thought -- I thought I had kept the '09 because of the

7    question we've got here.  But they took the wrong mower --

8    is what it boiled down to.  My son had the bagger on it, so

9    he give them the one --

10   Q.  You thought you could keep the '09, give it back to

11   Chase, and you'd be -- call it square, right?

12   A.  Pardon me?

13   Q.  You thought Chase had a security interest in the '09; is

14   that correct?

15   A.  Yes.

16   Q.  Okay.  City National Bank -- when you were late in

17   June -- July, on your payment, they contacted you almost

18   immediately; is that correct?

19   A.  Sure did.

20   Q.  And, basically, they said that, "We're coming to get our

21   stuff."

22   A.  Yes, sir.

23   Q.  If they had not done that, would you still be trying to

24   salvage this business?

25   A.  I'd be doing my best.

1   Q.   Okay.

2   A.   I mean, I'd keep using my savings 'til I just didn't

3   have a dime left.  I --

4   Q.   Okay.  At the time you bought the EverRide mower, did

5   you -- was there any doubt in your mind but what you would

6   be able to pay for it?

7   A.   No, sir, I thought I could pay for it, and I was still

8   fighting to keep this business.

9   Q.   And you were --

10  A.   I honestly was.

11  Q.   -- current on your loan to Chase --

12  A.   I was current on everything.

13  Q.   -- and all your other credit cards.

14  A.   On everything.  We weren't behind on anything, except

15  the one in question from the bank --

16  Q.   Yeah.

17  A.   -- which we were just --

18  Q.   That fell behind in July, and they jumped on you

19  immediately; is that correct?

20  A.   Yes, sir.  They didn't give us any slack.

21  Q.   All of these -- and I may have to ask Vadis about this,

22  but all of these, you said you never took a dime from the

23  business.

24            THE COURT:  Are you talking about -- what are you

25  talking about?  The exhibit -- which number?

1           MR. VIDMER:  The exhibits that were filled out by

2    them and filed with their bankruptcy.  I don't know what

3    exhibit he's got it.  I think it's Exhibit 3.

4           THE WITNESS:  The handwritten stuff.

5           MR. VIDMER:  Yeah.

6           THE COURT:  Exhibit 2.

7           MR. VIDMER:  Exhibit 2?  Yeah.

8           THE COURT:  Do you have a set of exhibits you can

9    give Mr. Vidmer --

10          THE WITNESS:  Here.  I'll give you this book, if

11   you want it.

12          THE COURT:  -- that are marked?

13          MR. VIDMER:  I -- well, okay.

14          MR. CRONE:  I'll let him borrow mine.

15          MR. VIDMER:  Yeah, I was just using --

16          THE WITNESS:  Here you go.  You want these?

17          THE COURT:  No, you need those, Mr. Turnbow.

18          MR. VIDMER:  This is the only one I'll be

19   referring to, I believe.

20   BY MR. VIDMER:

21   Q.  Do you know if these exhibit -- if the amounts -- the

22   expenses on these exhibits -- did they include your credit

23   card payments?  Or do I have to ask Vadis?  I don't --

24   A.  I don't -- I don't think they did.  I don't think they

25   included the credit cards and the -- some of the -- I don't

1    know.  Vadis --

2    Q.  Okay.

3    A.  -- can tell you for sure.  I can't honestly say.

4    Q.  Okay.  And the extreme expenses in June of 2009 of

5    $17,070 included both the mower, the -- and the tires you

6    had to replace on the trailer.

7    A.  And the guy to do my tree.  I don't know if that was

8    then --

9    Q.  Right.

10   A.  -- or later --

11   Q.  Okay.

12   Q.  -- but it was -- yes, sir.  We had some tires that just

13   blowed --

14   Q.  So but for the mower, June didn't look as bleak as it

15   appears that it was.

16   A.  Right.

17   Q.  Right.

18   A.  Right.  Oh, no, it didn't.  It -- no, it didn't.

19          MR. VIDMER:  I believe that's all I have of Mr.

20   Turnbow.

21          THE COURT:  Mr. Crone, any redirect?

22          MR. CRONE:  Just a couple.

23                    REDIRECT EXAMINATION

24   BY MR. CRONE:

25   Q.  Mr. Turnbow, prior to May of 2009, what was the largest

1  balance that you ever incurred on this Chase credit card?

2  A.  Oh, my, I don't recall.  We -- I don't recall the

3  largest balance I've ever incurred.  We've gotten them

4  [inaudible] before and paid them off and -- you know,

5  several times.  I don't recall the largest balance.

6  Q.  Prior to May of 2009, would you have ever incurred a

7  balance in one month of more than $3,000?

8  A.  Oh, possibly not.  I can't -- I don't -- I mean, that

9  would be hard to guess at that.  I would hope not, but it

10  could be, yes.  It's possible, I guess.  What are you

11  looking for?

12  Q.  Did you -- did you normally make the full payment on

13  your credit card statement each month?

14  A.  Well, you -- my wife could tell you that, for sure.  I

15  mean, I would hope so, but I couldn't honestly say.  My wife

16  will know.  She makes -- writes checks out.

17  Q.  Did you ever make a -- did you ever skip a payment on

18  this account?

19  A.  I can't -- I -- again, you'll have to ask her.  I

20  don't -- I wouldn't know.

21  Q.  Okay.

22          MR. CRONE:  I have on further questions, Your

23  Honor.

24          THE WITNESS:  I don't think so.  I think we were

25  all current.

1          THE COURT:  Mr. Vidmer, anything else?

2          MR. VIDMER:  Yeah, just to clarify what he said.

3                    RECROSS EXAMINATION

4     BY MR. VIDMER:

5     Q.  When he said did you make full payments on your credit

6     card, I think what he was referring to -- did you pay the

7     card off every month?

8     A.  Oh, no.  No, no, no, no.  We didn't pay if off every

9     month.  No, sir.  We made a monthly payment.

10    Q.  You made the full minimum payment or -- what --

11    A.  Right, yes.

12    Q.  Okay.

13    A.  We made -- yes.  No, we didn't pay it off every month,

14    no.  I didn't -- I misunderstood I suppose, yes.

15    Q.  That's all.

16          MR. VIDMER:  That's all I have, Judge.

17          THE COURT:  Okay.  You may step down, Mr. Turnbow.

18          THE WITNESS:  Thank you.

19          THE COURT:  Mr. Crone?

20          MR. CRONE:  Plaintiff calls Dustin Smurdom.

21          THE COURT:  Okay.  And spell the last name for us.

22          MR. CRONE:  S-m-u-r-d-o-m?

23          MR. SMURDOM:  Yes.

24      DUSTIN SMURDOM, PLAINTIFF'S WITNESS, SWORN

25                    DIRECT EXAMINATION

1    BY MR. CRONE:

2    Q.  Would you please state your name and address?

3    A.  Dustin Smurdom, 550 Business Center Drive, Heathrow,

4    Florida.

5    Q.  Okay.  And what is your occupation, Mr. Smurdom?

6    A.  I am the Chase card services vendor portfolio manager

7    for bankruptcy and estates.

8    Q.  Okay.  And how long have you held that position?

9    A.  For -- since the first of this year.

10   Q.  Okay.  What was your occupation prior to this?

11   A.  I was a project manager for about four years --

12   Q.  Okay.

13   A.  -- with J. P. Morgan Chase.

14   Q.  All right.  And in your present position, what are your

15   duties?

16   A.  I manage the account placements with outside vendors.

17   So we place Chapter 7 accounts -- this particular case with

18   outside attorney firms.

19   Q.  In your position, do you have custody and control of the

20   records concerning the Chase MasterCard account of Chad

21   Brooks Turnbow, with an account number ending in 2237?

22   A.  Yes.

23   Q.  And have you reviewed those records?

24   A.  Yes.

25   Q.  Okay.  When was this account opened, if you know?

1    A.   June 23rd of 1994.

2    Q.   Okay.  And was this account opened pursuant to an

3    application, signed by Mr. Turnbow?

4    A.   Yes.

5    Q.   Okay.  Now Mr. -- Chad Turnbow filed for relief under

6    the Bankruptcy Code on July 31 of 2009.  What was his

7    balance at that time on the Chase account?

8    A.   It was, I think, $13,630 and some change -- something

9    around that ballpark.

10   Q.   All right.  Well, let's see.

11   A.   Do we need this?  Is this what you're looking for?

12   Q.   You have one.  Okay.  If you could refer to Plaintiff's

13   Exhibit 3 -- that's been entered into evidence.  Do you

14   recognize that document?

15              THE COURT:  Do you need help, Mr. --

16              THE WITNESS:  Yes, if you could help me out too.

17              MR. CRONE:  Okay, I will.

18              THE COURT:  Fair for the gander, fair for the

19   goose.

20              THE WITNESS:  Okay.

21   BY MR. CRONE:

22   Q.   Okay.  What is that?

23   A.   Summary of the last three months of statement

24   information.

25   Q.   And why was that prepared?

1    A.   Because of the presumption period and the perceived

2    fraud --

3    Q.   And what period of time does it cover?

4    A.   Seventy days prior to bankruptcy -- a little bit --

5    Q.   Okay.

6    A.   -- a little bit more.

7    Q.   And how many charges were made in this period?

8    A.   You know what?  To be honest with you, I don't know

9    exactly how many, but excess of, I would say, 25.

10   Q.   Okay.  And were some of the -- were there some days

11   where there were multiple charges?

12   A.   Yes.  On June 21st, there were multiple charges of

13   almost $9,000 on June 21st.

14   Q.   And do you know what Mr. Turnbow's balance was on this

15   account at the end of May 2009?

16   A.   Off the top of my head, it was over $800.

17   Q.   And what was his balance at the end of April 2009?

18   A.   Seven seventy-two.

19   Q.   Okay.  For the year of 2009, what month had the most

20   charging activity on this account?

21   A.   June.

22   Q.   And what was his credit limit on the account?

23   A.   Thirteen thousand nine hundred.

24   Q.   Okay.  Did Mr. Turnbow exceed that limit at any time?

25   A.   He did; at the June cycle.  So the -- he went $95 over.

1    Q.  Okay.  And for the activity that is outlined or stated

2    in the 70-day period of Exhibit 3, is that similar or

3    different than prior activity under the account for the year

4    2009?

5    A.  Different.

6    Q.  Okay.  Given Mr. Turnbow's past history on his account,

7    though, was there anything that threw up red flags prior to

8    the June activity --

9    A.  No.

10   Q.  -- that would have alerted Chase to any problems on the

11   account?

12   A.  No.

13   Q.  Okay.  So, basically, when Mr. Turnbow went and made the

14   charges, there was no reason to believe that he would not

15   pay.

16   A.  That's correct.

17   Q.  Okay.

18             MR. CRONE:  No further questions.

19             THE COURT:  Mr. Vidmer?

20             MR. VIDMER:  I have on questions of this Witness,

21   Judge.

22             THE COURT:  You may step down --

23             THE WITNESS:  Thank you.

24             THE COURT:  -- Mr. Smurdom.

25             THE COURT:  You have another witness?

1          MR. CRONE:  No, I don't, Your Honor.  I'm

2     finished.

3          THE COURT:  Okay.  Mr. Vidmer, do you have any

4     witnesses?

5          MR. VIDMER:  I'll call Vadis Turnbow.

6          THE COURT:  Okay.  You want to go get her?

7          MR. VIDMER:  Sure.

8          THE COURT:  Are you going to need to call Mr.

9     Turnbow?

10          MR. VIDMER:  I don't believe I'll need

11     [inaudible] --

12          THE COURT:  No, I -- not necessary.  I was just

13     wondering.

14          Did you have to fly in, Mr. Smurdom?

15          MR. SMURDOM:  Yes.

16          THE COURT:  Where'd you fly to?

17          MR. SMURDOM:  Orlando.

18          THE COURT:  No, I mean --

19          MR. SMURDOM:  Oh, Nashville.

20          THE COURT:  Nashville?

21          MR. SMURDOM:  Yes.

22          MR. TURNBOW:  It's okay if I stay, right?

23          THE COURT:  Yes.

24          VADIS TURNBOW, DEFENDANTS' WITNESS, SWORN

25                    DIRECT EXAMINATION

1    BY MR. VIDMER:

2    Q.  Would you state your name and address for the Court?

3    A.  Vadis Turnbow, 1097 State Route 1241, but it --

4    Mayfield, Kentucky 42066.

5    Q.  And you're Chad's wife?

6    A.  Yes, sir.

7    Q.  Okay.  Now, Chad and you, together, I guess, were in the

8    lawn-service business; is that correct?

9    A.  Yes.

10   Q.  And you pretty much took care of the books -- took care

11   of the financial end of it, and he did the work.  Is that

12   correct?

13   A.  Right, 'cause I have back trouble; I can't do the work.

14   Q.  Okay.  Do you --

15            MR. VIDMER:  May I approach the Witness, Judge.

16            THE COURT:  Yes.

17   BY MR. VIDMER:

18   Q.  Show you these.  Do you recognize those -- what they've

19   labeled as Exhibit 2?

20   A.  Two.  Yes.

21   Q.  And those were prepared at my request?  Is that correct?

22   A.  Yes, sir.

23   Q.  And they show a monthly income and expenses for the

24   business; is that correct?

25   A.  Yes, best as I can tell.

1    Q.  Okay.  If you'll look at page one -- or the first of

2    those for January --

3    A.  Oh, January?

4    Q.  Yeah, down at the bottom, it has, "Note one seven,

5    National City Bank, interest payment 126 BB (phonetic) card

6    member services."  Did the loss -- did the amounts that you

7    put in here, under expenses -- did they include payments on

8    credit card payments or --

9    A.  Would you say that again?  I didn't understand you.

10   Q.  The amounts you've included on expenses here -- did they

11   include payments for credit card payments or not?

12   A.  Yes, they did.

13   Q.  Okay.  And when -- so this, down here, at the bottom --

14   "City National Bank and BP (phonetic) card members

15   services" -- those were included in the total expenses; is

16   that correct?

17   A.  Yes, to the best of my recollection.

18   Q.  Okay.  And with each other page, you got HSBC, Chase on

19   February, A T and T Advertising, City National.

20   A.  Where are we at?

21   Q.  On February, next page.

22   A.  Oh, February.  February.  Okay.  I'm sorry.  Okay.

23   Q.  Those were included in the total expenses?

24   A.  Yes.

25   Q.  Okay.  So when Chad says he wasn't taking a check or

1    making any money on the business, he was, in fact, paying

2    his credit card -- servicing his debt with the business.

3    A.   Yes.

4    Q.   Yes.

5    A.   Yes.

6    Q.   Okay.  And if you'll look at June -- the last one of

7    those, I believe it is.

8    A.   Okay.

9    Q.   Okay.  It shows total expenses of $17,070.50, correct?

10   A.   Yes, sir.

11   Q.   And under "Inventory Purchases, Including Raw

12   Materials," you have $9,990.  You see where I'm talking

13   about?

14   A.   Where at?  Oh, okay.

15   Q.   For -- under "Inventory Purchases."

16   A.   "Inventory Purchases."

17   Q.   Yeah.

18   A.   Yes, I see that.

19   Q.   Does that include the cost of the EverRide mower that

20   was purchased in June?

21   A.   I believe so.

22   Q.   Okay.  So the loss -- but for the EverRide motor --

23   mower wouldn't have been nearly as significant as it shows

24   that it was.

25   A.   No, huh-uh.

1   Q.   Okay.  Now, you were current on all your payments

2   through June; is that correct?

3   A.   Yes, sir.

4   Q.   Okay.  And I believe City National pretty much -- you

5   got late one time because of -- and they immediately jumped

6   on you, is that correct?

7   A.   Yeah, they kind of got upset a little bit, I think.  And

8   I say upset.  I don't know whether they were upset.  They

9   were just looking for their money.

10  Q.   And, basically, they called in the loan?

11  A.   Yes.

12  Q.   And that pretty much put you out of business -- because

13  they had every -- all of your equipment was secured by them,

14  is that correct?

15  A.   Right, it --

16  Q.   Okay.  If City National had allowed you to remain in

17  business, do you think you would still -- or you and Chad

18  would still be trying to make this business work?

19  A.   We would probably be trying to get rid of it, but we

20  would be trying to make it work.  I mean, we --

21  Q.   Uh-huh.

22  A.   To -- we -- to file bankruptcy was the last thing on our

23  mind.  We did not want -- we held out.  You can see, by all

24  the transfers of personal money that we transferred from our

25  personal account, trying to keep it going.  We were, you

1    know -- had been on trying to keep it going and thinking,

2    okay.  And then, when the ice storm hit, we thought we had a

3    real break there.  And as it turned out, it didn't work out

4    that way.

5    Q.  Basically everybody in the country with a bucket truck

6    showed up in west Kentucky --

7    A.  Exactly.

8    Q.  -- didn't they?

9    A.  Exactly.

10   Q.  So you -- your income, other than from the lawn-service

11   business, totals about $4,000 a month; is that correct?

12   A.  Yes, sir.

13   Q.  And when did you pay your bills -- typically?

14   A.  Typically, a lot of them were automatic drafts --

15   Q.  Uh-huh.

16   A.  -- you know, whatever the due date were -- was --

17   because our income, as you could see on our statement, was

18   at odd times.

19   Q.  Uh-huh.

20   A.  It was four different times of the month.  So --

21   Q.  Uh-huh.

22   A.  -- we had to kind of stagger things for that.  And --

23   Q.  But this -- go ahead.

24   A.  Prior to the -- prior to us taking over -- taking back

25   over the business, he had purchased a truck.  Paid cash for

1    it.  So he sold it for cash, and that money was used in the

2    business -- to help try to keep it afloat.

3    Q.  Okay.  All right.  But as far as -- if you showed a

4    $4,000 balance at the end of the month on your checking

5    account, it could well be that checks were already

6    outstanding that were going to eat that up, is that right?

7    A.  Oh, yeah, definitely.

8    Q.  Okay.  At the time, did you discuss buying this EverRide

9    mower on the Chase account with Chad?

10   A.  He made -- he mentioned something about the mower.  He

11   said, "We're going to have to buy a mower."

12         I said, "We can't afford to buy a mower."

13         He said, "We've got to.  Both of them are down."

14   And we -- you know, right -- it was the prime time that

15   grass was growing really good.  And so I -- he -- I think --

16   if I remember correctly, I think he said what -- "How can we

17   buy -- we've got to buy another mower if we're going to stay

18   in this business."

19         And I -- if I remember correctly, I think I said,

20   "Well, we've got some money available on that credit card,

21   and let's use that.  And then, hopefully, we'll get it, you

22   know, paid off."  So it just --

23   Q.  And at the time he did that, you fully intended to pay

24   it off.

25   A.  Yes.

1    Q.  And you would have continued to have income that would

2    help pay those bills, but for City National, is that

3    correct?

4    A.  Yes.

5    Q.  Okay.

6              MR. VIDMER:  I believe that's all I have, Judge.

7              THE COURT:  Mr. Crone?

8                         CROSS EXAMINATION

9    BY MR. CRONE:

10   Q.  Mrs. Turnbow, I believe you stated that you told your

11   husband, "We can't afford a mower."  Is that -- those were

12   your words to him?

13   A.  Kind of something like that, I think.

14   Q.  Okay.  I believe you testified, also, that -- when you

15   were answering Mr. Vidmer's questions on your bank

16   account -- that, basically, the 4,000 and so that goes in

17   from retirement and Social Security, you have to use for

18   your normal living expenses every month --

19   A.  Yes, sir.

20   Q.  -- is that correct?

21   A.  That's correct.

22   Q.  And that shows on your bankruptcy petition, also -- the

23   Schedule I and J of income and --

24   A.  Right.

25   Q.  -- expenses; is that correct?  So the only means of

1    paying your debts, including Chase, would be income from the

2    lawn-care business.  Is that correct?

3    A.  Well, at that point in time, yeah, basically, yes.

4    Q.  Okay.  And we've gone over -- you've gone over some of

5    the business income and expenses, and I believe -- it's my

6    understanding that you prepared these.  And in the six

7    months prior to bankruptcy filing, you have a loss for five

8    of those months.  Is that correct?

9    A.  Yeah, we did.  And I can back up a little bit and say

10   that I was a little bit -- I guess you would say not at

11   myself whenever we -- during part of this time because I had

12   had -- in 2008, I had had a real major surgery; in the

13   hospital for 12 days.  Then, in 2009, I had an accident

14   where my son was in the vehicle with me, and I pulled out in

15   front of a car, and it flipped us over about four times.  I

16   don't -- I stayed conscious through the whole thing.  My son

17   was unconscious.  He was thrown through the -- from the

18   passenger side, over my shoulder, through the window.  And

19   his head -- we happened to be laying on a guardrail.  And

20   his head was laying out, crooked and blood laying by the

21   side of it.  And when we both got to the hospital, his neck

22   was broken in three places.  And so, by the grace of God,

23   he's not paralyzed -- and a good doctor.

24            And so that all had happened.  And then, prior to

25   that -- let's see.  Was it before that or -- no, it was

1    after that, 'cause I figured that probably's what did it.  I

2    kept having these flashing lights in my right eye.  So then

3    I had to have detached retina surgery in this eye.

4           So during all this, my focus wasn't on it as much

5    as it really should have been.

6    Q.  I understand that, and I appreciate that.

7    A.  If that makes any sense.

8    Q.  It does.  I'm going to show you -- I'll just bring it up

9    to you, if I may.

10   A.  Okay.

11   Q.  A page of the return.

12   A.  Okay.

13   Q.  It'd be a page out of Plaintiff's Exhibit 6.

14   A.  Okay.

15   Q.  It's a tax return, "Profit and Loss."  Are you familiar

16   with that?

17   A.  Yes.

18   Q.  And that's for 2008.

19   A.  Uh-huh.

20   Q.  Okay?  And from the lawn-care business, what profit did

21   you have for 2008?

22   A.  Okay.  Let me see if I can find it, here.  Let's --

23   okay, this page is [inaudible].  Okay, 159.

24   Q.  Hundred and fifty-nine dollars.

25   A.  This eye thing is really bothering me.

1  Q.  Okay.  I'm sorry.  So a hundred and fifty-nine

2  dollars' --

3  A.  Yes.  I'm --

4  Q.  -- profit for '08?

5  A.  Yes.

6  Q.  Losses for five out of six months in '09 -- correct --

7  out of the lawn-care business?

8  A.  I'm sure it is.

9  Q.  Okay.

10  A.  I'm sure that's correct.

11  Q.  And this was going to provide the only means of paying

12  for this lawnmower that was purchased -- was profit from the

13  business.  Is that correct?

14  A.  Yeah, we were hoping for a miracle, I think.

15  Q.  All right.  Now, you stated that a bank -- a secured

16  lender that had your equipment was making a demand for

17  turnover of your equipment.  Did you consider filing a

18  Chapter 13 Bankruptcy?

19  A.  We didn't know what to do, and that's why we contacted

20  Mr. Vidmer.

21  Q.  Okay.  But did you have -- I believe the testimony from

22  you -- and your husband -- is that, when you bought the

23  tractor --

24  A.  It was a --

25  Q.  -- that you believed you could afford to make the

1  payments on it because the business would pick up.  Is that

2  correct?

3  A.  Yeah, it was June, and we kept thinking, you know, it's

4  going to get better, it's going to get better, you know.

5  Q.  Did you consider the possibility of Chapter 13 or some

6  other type of reorganization to give you a chance to have

7  that business picked up?

8  A.  We took the advice of our attorney, 'cause we didn't

9  know what to do.

10  Q.  Okay.

11  A.  We've never dealt with this.  We've always paid our

12  payments on time.  You know, if you check our credit

13  history, we've had very good credit ratings.  I mean, you

14  know, we've never run into this problem before.  This is a

15  new thing for us, and it's not something we wanted to do.

16  Q.  Okay.  Did you make the payments on the credit card

17  bills and other bills out of the business?

18  A.  Most of the time, I made them -- I made some of them out

19  of the business and some of them out of our personal

20  account.  I mean, it would just -- it was kind of like, you

21  know, whichever one -- we had money in it.  But I did make

22  some credit card payments out of our personal account, yes.

23  Q.  Okay.  On the Chase MasterCard that we're talking about

24  here, today --

25  A.  Okay.

1   Q.  -- prior to May of 2009, what was the largest balance on

2   that that you can recall?

3   A.  Prior to 2009.

4   Q.  Prior to May of 2000 -- prior to buying the tractor,

5   what was the largest balance on that account -- any

6   particular month?

7   A.  I couldn't tell you.  If I said an amount, it would -- I

8   wouldn't -- I can't recall.

9   Q.  Okay, so you don't recall.

10  A.  No.

11  Q.  Okay.

12  A.  'Cause we had several credit cards going at that time.

13  Q.  On that account, did you ever miss a payment?

14  A.  No, sir.

15  Q.  Okay.  Did you usually pay more than the minimum

16  payment?

17  A.  Most of the time, no.

18  Q.  Okay.  All right.  Okay.

19          MR. CRONE:  I have no further questions, Your

20  Honor.

21          THE COURT:  Mr. Vidmer?

22                  REDIRECT EXAMINATION

23  BY MR. VIDMER:

24  Q.  Although the business was doing poorly --

25  A.  Uh-huh.

1    Q.  -- it was helping to service your ongoing debt up until

2    July of 2009; is that correct?

3    A.  Yes, sir.

4                MR. VIDMER:  That's all I have, Judge.

5                THE COURT:  All right.  Is that -- does that

6    conclude your proof, Mr. Vidmer?

7                MR. VIDMER:  I believe it does, yes, sir.

8                THE COURT:  You may step down, Ms. Turnbow.

9                THE WITNESS:  Thank you.

10               THE COURT:  That concludes the proof on this case?

11               MR. CRONE:  It does, Your Honor.

12               THE COURT:  Okay.  All right.  I don't think I

13   need any closing arguments, but if you'd like to make them,

14   you're welcome to; but this has not gone on that long.

15               MR. CRONE:  [Inaudible] closing argument, Your

16   Honor.

17               THE COURT:  Okay.

18               MR. VIDMER:  I would just ask -- reiterate my

19   closing statement --

20               THE COURT:  Sure.  And I will say this, Mr. Crone.

21   Although you have filed numerous adversarial proceedings in

22   cases, and they've been settled over the years -- and I do

23   appreciate that -- but I also appreciate how well prepared

24   you were today.  It was --

25               MR. CRONE:  I appreciate that, Your Honor.  Thank

1    you.

2            THE COURT:  Well, it -- not always that I get

3    that, Mr. Crone, and I want to let you know how much I

4    appreciate it.

5            MR. CRONE:  Thank you.

6            THE COURT:  We'll take this matter under

7    submission.  We should have something out by the end of the

8    month.

9            All right.  Thank you very much.

10           MR. VIDMER:  Thank you.

11           MR. CRONE:  Thank you, Judge.

12           THE COURT:  Hope you have a pleasant trip back to

13   Florida.

14           MR. VIDMER:  Thanks.

15        (Court adjourned at 1:41 p.m.)

16                        ***   ***   ***

17

18

19

20

21

22

23

24

25

                            INDEX

                                                      Further
                    Direct   Cross   Redirect   Recross   Redirect

**WITNESS FOR THE
PLAINTIFF**
Chad Brooks
    Turnbow          9        59        66        68
Dustin Smurdom       69

**WITNESS FOR THE
DEFENDANTS**
Vadis Turnbow        74       80        85

1                    ***   ***   ***

2    I, court-approved transcriber, certify that the foregoing is
     a correct transcript from the official electronic sound
3    recording of the proceedings in the above-entitled matter.

4

     _____        _____
5    Karen D. Cunningham                      Date
     Independent Transcriptionist
6

7

     _____
8
     Karen D. Cunningham
9    Typed Name

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25